IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID DEWAYNE JONES, JR.,

   Plaintiff,

v.

LT. S. ELLIOTTE,

   Defendant.

Civil Action No.: JRR-21-1949

## MEMORANDUM OPINION

Pending before the court is the Motion to Dismiss, or, in the Alternative, for Summary Judgment, filed by Defendant Lt. Stephen Elliott.[1] ECF No. 13 (hereafter the "Motion"). Lt. Elliott requests dismissal of, or summary judgment on, the claims asserted in Plaintiff David Dewayne Jones Jr.'s complaint (ECF No. 1). Mr. Jones responded to the Motion (ECF No. 21) and Lt. Elliott replied (ECF No. 24).[2] No hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons stated below, Lt. Elliott's Motion shall be granted.

## BACKGROUND

### A. Complaint Allegations

Mr. Jones alleges that, beginning April 6, 2020, he worked at Eastern Correctional Institution ("ECI") as an Inmate Observation Aid ("IOA") where he observed, recorded, and interacted with inmates considered to be suicidal or harmful to other inmates. ECF No. 1 at 4. According to Mr. Jones, this is a preferred job requiring screening and approval by Lt. Elliott. *Id.*

---

[1] The Clerk shall amend the docket to reflect Defendant's full and correct name.

[2] Mr. Jones also filed a Motion Seeking Leave to Respond to Defendant's Reply on August 22, 2022. ECF No. 27. Unless otherwise ordered, a surreply is not permitted. *See* Local Rule 105.2(a) (D. Md. 2021). A surreply is permitted when the moving party would be unable to contest any matters raised by the opposing party in their reply for the first time. *See Lewis v. Rumsfeld*, 154 F. Supp.2d 56, 61 (D. D.C. 2001). Defendants have not raised new matters for the first time in their reply. Therefore, the Motion is denied and the surreply (ECF No. 26) will not be considered.

Mr. Jones asserts that from the start of his IOA position until September 12, 2020, facility policies authorized and signed by Lt. Elliott prohibited IOAs from use of open cells as a restroom. *Id.* On September 14, 2020, Lt. Elliott posted a new policy, which was not approved by the ECI Warden, stating that IOA workers were no longer permitted to use the restroom in that building, nor could they return to their own housing unit to use the restroom. *Id.* at 4, 5; *see* ECF No. 1-1 (Memorandum dated September 14, 2020). Mr. Jones, whose six-hour shift began at 4:30 p.m., ate dinner before his arrival and was allowed to bring food and coffee with him. ECF No. 1 at 4. A week following the rule change, Mr. Jones informed Sgt. Steele that he needed to use the restroom urgently, but was told he would be fired if he went to use the restroom and was instructed to wait. *Id.* Mr. Jones noticed in December and January 2021 that he could not hold his urine without experiencing sharp pain and often felt the need to urinate immediately after using the restroom. *Id.* at 5. He states that the issue was ongoing in March 2021, and he wrote to the medical department in April 2021 to get paperwork which would allow him to access the restroom. *Id.* He states that he still has to wait between 10 and 45 minutes. *Id.*

Mr. Jones says that he feared losing his job because Lt. Elliott supervises the IOA workers and has fired other inmates in the past for complaining about this issue. ECF No. 1 at 5. He claims that another IOA who raised the issue with Chief of Security Brittingham in September 2020 was placed in segregation two days later for approximately 30 to 45 days even though he was not charged with an infraction. *Id.* Mr. Jones seeks monetary compensation. *Id.* at 6.

**B. Administrative Remedy Procedures**

Mr. Jones states that he did not file a grievance concerning the denial of bathroom access because he feared he would be fired or that he would lose good conduct credits. ECF No. 1 at 2. Lt. Elliott submits the declarations of the Administrative Remedy Coordinators at both ECI and

Central Maryland Correctional Facility ("CMCF"), where Mr. Jones was transferred on April 1, 2021. ECF No. 13-5 (Ex. 3, Ward Decl.); ECF No. 13-6 (Ex. 4, Miller Decl.). Both Coordinators attest that Mr. Jones did not file any relevant grievance following the September 2020 change in bathroom policy. *See* ECF No. 13-5 at ¶ 3, p. 3-9; ECF No. 13-6 at ¶ 3, p. 3-20.[3] Lt. Elliott also submits the declarations of a Case Management Specialist in the Department of Public Safety and Correctional Services Headquarters in the ARP/IGP Unit, affirming that Mr. Jones filed no appeals since 2011. ECF No. 13-7 at ¶ 2 (Truitt Decl.).

### C. ECI Inmate Observation Aid Program

The following facts are undisputed:

Lt. Elliott was the ECI Housing Unit 4 Manager in 2020 during the times relevant to the complaint. ECF No. 13-3 at ¶ 2 (Elliott Decl.). Before the COVID-19 pandemic, suicidal inmates were housed in an administrative segregation observation area ("ASOA") on the east side of the prison. *Id.* at ¶ 3. The IOAs resided in East Compound Housing Units 6, 7, and 8, each of which contains approximately 20 single cells. *Id.* IOAs are compensated at about twice the rate of an average inmate wage and also receive 10 good conduct credits each month. *Id.* at ¶ 4. Each IOA is responsible for observing one inmate on suicide observation and must remain alert to notify correctional staff if an inmate's "behavior shifted toward self-harm." *Id.* at ¶ 5; *see also* ECF No. 13-4 at 7 (Lesson Plan for Training IOAs). IOAs are required to meet specific eligibility criteria: they must be infraction-free, have a high school diploma or equivalent, and must be deemed suitable "by several departments." ECF No. 13-3 at ¶ 6. Due to the pandemic, the ASOA was moved to the west side of ECI so that high-risk and COVID-positive inmates could be housed on the east side. *Id.* at ¶ 7. The move prompted hiring of new IOAs from the West Compound

---

[3] Citations refer to the pagination assigned by the court's Case Management and Electronic Case File (CM/ECF) system.

Housing Units 1, 2, 3, and 4. *Id.* at ¶ 8. After the vetting process, the chosen IOAs resided on various tiers in the West Compound, which Lt. Elliott asserts presented a risk of moving contraband into and through the ASOA housing unit. *Id.*

IOAs are assigned to work in 4-hour shifts, the purpose of which is to ensure they can direct their full attention to their responsibilities. ECF No. 13-3 at ¶ 10. However, due to the pandemic, occasionally IOAs were scheduled to work up to eight hours. *Id.* Restrictions were placed on the frequency of bathroom breaks to ensure adequate coverage. *Id.* at ¶ 11. As had been the case in the East Compound, IOAs were permitted to use the restroom in empty cells on the tiers; however, in August 2020, Lt. Elliott attests IOAs were smuggling contraband onto the tier and using the bathrooms as a point of exchange. *Id.* at ¶¶ 11-12. Lt. Elliott contacted Dr. Yvette Kovner, Chief of Psychiatry, about the issue, which resulted in a policy change prohibiting bathroom use on the tier and requiring IOAs to be strip searched upon their exit or reentry if they needed to return to their tier to use the restroom. *Id.* at ¶ 13. Each time an IOA left the tier, another IOA would have to replace the departing IOA and be strip searched upon arrival, which requires the attention of at least two correctional officers each time. *Id.* at ¶ 14. Despite these efforts to curb the movement of contraband, it continued to move through the ASOA tier. *Id.* at ¶ 15. Additionally, Lt. Elliott states that IOAs would "abuse the break" by taking a break early in their shift and then not returning for an hour or more. *Id.* at ¶ 16.

As a result, in September 2020, IOAs generally were not permitted to leave the tier during 4-hour shifts. ECF No. 13-3 at ¶ 17. Those working shifts longer than four hours were still permitted to leave the tier, subject to the strip search policy. *Id.* Lt. Elliott also asserts that if an IOA needed to use the restroom "later into a 4-hour shift" he was permitted to leave the tier. *Id.* Following the policy change, the movement of contraband seemed to slow; Lt. Elliott notes that

smoking on the tier appeared to stop in October 2020. *Id.* at ¶ 18. The policy remained in effect because some contraband smuggling continued. *Id.* at ¶ 19; *see* p. 8 (Notice of Inmate Rule Violation for inmate Brandon Burroughs).

Lt. Elliott states that the ECI Day Shift Captain Hance Pepper, Major Milligan, the Warden's office, and Dr. Kovner were aware of the changes in bathroom policy. ECF No. 13-3 at ¶ 20. He attests that at no time did he receive instruction to change the procedures and asserts that, had a superior officer instructed him to do so, he would have complied. *Id.*

### D. Jones' IOA Tenure

Mr. Jones was hired as an IOA from April 6, 2020, until on or about April 1, 2021, when he was transferred from ECI. ECF No. 13-3 at ¶ 9. Lt. Elliott denies that Mr. Jones ever reported bladder weakness, incontinence or pain related to the limitations on bathroom use, or that he was aware of any risk to Mr. Jones' health. *Id.* at ¶¶ 22, 30. Lt. Elliott attests that, in the event an IOA reported a bladder-related medical issue that required increased bathroom access, such access would have been permitted. *Id.* at ¶ 23. Lt. Elliott attests further that he did not retaliate against any of the IOAs. *Id.* at ¶ 24. Additionally, he denies being aware of any IOA placed in segregation without an infraction in September 2020 or that any officer told an IOA he would be fired for asking to use the bathroom. *Id.* at ¶¶ 26, 28.

### E. Jones' Medical Records

The following facts are undisputed:

While housed at ECI, Mr. Jones filed six sick call requests between June 1, 2020, and April 1, 2021, none of which related to bladder issues or incontinence. ECF No. 13-8 at 12, 16, 21, 25, 30, 31 (Medical Records). Mr. Jones was seen by the medical department on seven occasions during this same period and on none of these visits did he report incontinence or pain related to a

bladder issue. *Id.* at 10-11, 19-20, 23-24, 26-29, 32-34. Additionally, his transfer screening form does not note any medical issues or alerts. *Id.* at 8.

Following his transfer to CMCF, Mr. Jones submitted six sick calls and was seen in the medical department on twelve occasions. Out of the six sick calls, one submitted on April 19, 2021, asserted that Mr. Jones had filed a sick call at ECI in March and was having a problem holding his urine, stating that at times he would use the restroom and feel like he needed to go again minutes later. ECF No. 13-8 at 35; *see also* p. 42, 46, 49, 54, 55. In response, he was seen by a doctor on April 20, 2021, and issued a medical order for "access to bathroom [for] medical issue." *Id.* at 7, 36. At no other medical visit did he complain of incontinence issues; nor was he diagnosed with incontinence. *Id.* at 36, 40-41, 43-45, 47-48, 50-53, 57-61.

## STANDARDS OF REVIEW

### A. Motion to Dismiss

Lt. Elliott's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016)

6

(per curiam). As is the case here, when a movant titles its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, FEDERAL PRACTICE & PROC. § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

## B. Discovery

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*, *Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (*per curiam*); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. FED. R. CIV. P. 56(d); *see also Harrods Ltd.*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods Ltd.*, 302 F.3d at 244 (citations omitted).  Despite the absence of the non-moving party's Rule 56(d) affidavit, the court shall not issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002) (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

C. **Summary Judgment**

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting FED. R. CIV. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact

precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

### A. Exhaustion of Administrative Remedies

Lt. Elliott raises the affirmative defense that Mr. Jones failed to exhaust his administrative remedies. If Mr. Jones' claim has not been properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or

diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'…normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he…PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the court is

"obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process that must be exhausted. MD. CODE REGS. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. MD. CODE REGS. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); MD. CODE REGS. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); MD. CODE REGS. § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. MD. CODE REGS. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). MD. CODE. ANN., CORR. SERVS. §§ 10-206, 10-210; MD. CODE REGS. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. MD. CODE ANN., CORR. SERVS. § 10-210(a).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." 578 U.S. 632, 635 (2016). Specifically the Court rejected a "special circumstances" exception to the exhaustion requirement but reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 635-36. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d at 725.

13

An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *Chase v. Peay*, 286 F.Supp.2d 523, 529-30 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004). As a prisoner, Mr. Jones is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. at 643-44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

It is undisputed that Mr. Jones did not file an ARP, at either ECI or CMCF, complaining about Lt. Elliott's policy denying IOAs access to the bathroom during their shift. Importantly, based on the ARPs he did submit, Mr. Jones was obviously aware of how to use the ARP process at both facilities. The court also notes that Mr. Jones filed other grievances related to his IOA

14

position, including complaints that he had not received his pay or good conduct credits (ECF No. 13-5 at 4) and regarding post-shift recreation time. (*Id.* at 8-9). Regardless, the ARP process could be deemed unavailable to Mr. Jones if (l) the threat of intimidation actually deterred him from lodging a grievance or pursuing a particular part of the administrative process; and (2) the threat would deter a reasonable inmate of ordinary firmness and fortitude from doing so. *See, e.g., Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *see also Kaba*, 458 F.3d at 685-86; *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). Mr. Jones contends that Sgt. Steele threatened to terminate him if he used the bathroom in the empty cell on the tier, returned back to his unit to use the bathroom, or took "any action against him and/or the Defendant, concerning the situation." ECF No. 21 at 3. He also states he was intimidated by Lt. Elliott due to previous actions taken against IOAs who complained about him. *Id.* at 10. Mr. Jones asserts that this discouraged him from filing a complaint regarding bathroom access. *Id.* at 3. The court need not reach this issue, however, because, as discussed below, Mr. Jones cannot succeed on his conditions claim.

Additionally, to the extent Mr. Jones sought to bring a separate claim for retaliation based on these allegations of intimidation, he fails to state a claim for relief. In order to prevail on a claim of retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Here, on its face, the complaint does not allege retaliatory action by Lt. Elliott. Although Mr. Jones alleges that he feared he might be fired for filing a grievance, he does not assert that he was in fact fired or that he suffered any adverse action following a protected act. Further, Mr. Jones does not allege that the bathroom policy was instituted in retaliation for Mr. Jones exercising a constitutionally protected right.

B. **Conditions of Confinement**

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id*. In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011).

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference such that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U.S. at 302-303 (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

As a preliminary matter, the court acknowledges that the parties appear to disagree about the details of the IOA program's bathroom policy. Mr. Jones contends there was a categorical denial of access to bathrooms during shifts while Lt. Elliott asserts that IOAs were permitted to use the bathroom in an emergency, "later" in a 4-hour shift, or during shifts lasting longer than eight hours. Notably, Mr. Jones attaches a copy of the posted policy, which sets forth none of the alleged exceptions to the prohibition. *See* ECF No. 21-2 at 1. Regardless of the actual policy, however, Mr. Jones' claim fails, as he fails to support his claim with competent evidence that Lt. Elliott had a sufficiently culpable state of mind demonstrating deliberate indifference.

The court construes the facts in Mr. Jones' favor because he is the non-movant; therefore, the court accepts as true his allegations that he has experienced urinary incontinence and related discomfort. Even though Mr. Jones did not necessarily show symptoms of incontinence while he was an IOA, the court appreciates that restrictions on bathroom access could have caused his later incontinence for which he received a bathroom pass from the medical staff at CMCF. However, even assuming that Mr. Jones' incontinence in April 2021 resulted from not being able to use the restroom for six hours at a time during his IOA shifts between September 2020 and April 2021,

the record is devoid of evidence on which a factfinder might reasonably rely to conclude that Lt. Elliott was deliberately indifferent.

Nothing in the record demonstrates that Lt. Elliott was aware that the restrictions, implemented for the reasonable purpose of eliminating contraband on the ASOA tier, would put Mr. Jones, or the other IOAs, at an excessive risk of developing incontinence. Further, the record does not support a finding that Mr. Jones, or any other inmate, reported issues related to incontinence to Lt. Elliott. Although Mr. Jones states Lt. Elliott knew he arrived at his shift following dinner, it does not follow that because he knew Mr. Jones had recently eaten, that Lt. Elliott knew (or reasonably should have known) that Mr. Jones was at risk of incontinence during his shift. Thus, even assuming Mr. Jones suffered an extreme deprivation as a result of the disputed policy, there is no dispute that Lt. Elliott did not possess the requisite state of mind. Therefore, he entitled to judgment in his favor.

## Conclusion

For the foregoing reasons, Mr. Jones' Motion Seeking Leave to Respond to Defendant's Reply will be denied, and Lt. Elliott's Motion will be granted. Judgment will be entered in Lt. Elliott's favor and this case will be closed. A separate order follows.

January 22, 2023

/S/
_____
Julie R. Rubin
United States District Judge